DORE, Judge.
The plaintiff has filed this suit in which he is seeking to recover compensation for total and permanent disability as the result of an alleged accident in which a log fell on his back on October 8, 1947, while employed by the defendant. He is asking for judgment at the maximum rate then in effect, $20.00 per week, from the date of the injury for a period not exceeding 400 weeks, with credit for compensation payments previously paid, together with interest.
The defendant admitted the material allegations and admitted the payment of compensation up to February 5, 1949, on which date the defendant set forth in its answer that the plaintiff was well and able to return to his former employ and perform all duties thereof.
After trial, the District Court with written reasons rendered judgment in favor of the plaintiff as prayed for. From this judgment, the defendant has appealed.
As it is admitted that plaintiff did receive injuries on the date alleged, for which compensation was paid through February 2, 1949, amounting to $1380.00, together with medical expenses of $739.40, the questions to be determined are whether or not plaintiff had recovered from the injury and resulting disability when his compensation was discontinued, and if he had not recovered at that time, would he have done so had he cooperated with his doctors? The answer to these questions involves principally the weighing and evaluation of the testimony given in the case, most of it of a medical nature. The trial judge found as a fact that plaintiff had not fully recovered from his injuries when the compensation ceased and that plaintiff, at the time of the trial of the case, was totally and permanently disabled. He also found that the plaintiff was not unreasonable in hesitating to perform the exercises prescribed for him in that such exercises would produce such pains as necessitating sedatives. In other words, the trial judge resolved these two questions in favor of the plaintiff.
The witnesses who testified in the case were the plaintiff, a resident insurer in charge of claims, and seven doctors composed of three radiologists, two general practitioners, an orthopedic surgeon, and a general surgeon. The medical testimony is quite conflicting.
*95 On October 8, 1947, the plaintiff was injured as the result of an accident in which a log fell on his back and he was immediately taken to Dr. J. H. McClendon of Amite, who referred him to New Orleans, where he was seen the same day by Dr. J. K. Stone, who thereafter treated him and who, on that date, diagnosed his injuries as severe contusions, hematoma, multiple abrasions of the left side of his face, severe contusions of the chest and back, with probably fracture and shock. X-rays were made and the plaintiff was found to have a fracture of the first left rib and a compressed fracture of the first lumbar vertebra. In Dr. Stone’s report of October 13th, 1947, he stated that he estimated plaintiff’s disability at approximately six months.
On October 14th, he was placed in a plaster of Paris cast and kept in the hospital until October 19th, during which time he could walk around the hospital if he so desired. On the latter date, he returned to Amite, where he was under the treatment of Dr. McClendon, with instructions to report to the latter doctor at least once a week for six or eight weeks, and at the end of that time, to return to the hospital for the removal of his cast and the fitting of a Taylor brace. The plaintiff returned to Dr. Stone as instructed on December IS, 1947, and the cast was removed, and X-rays then taken showed a sufficient healing. A Taylor brace was made for him and fitted, and he was discharged from the hospital on December 19, 1947. He then returned to Dr. McClendon and was given physiotherapy treatments.
He was seen by Dr. Stone again on January 19, 1948, February 19, 1948, March 18, 1948, April 20, 1948, June 21, 1948, and January 21, 1949. In February, Dr. Stone again had X-rays made and he was still of the opinion that plaintiff should discard his brace, that some form of physiotherapy should be instituted daily, that he be treated with massage and exercise which should involve stooping and bending, both front and laterally, so as to restore the function of his muscles, and that if suffering at the end of the active motion, he be given a mild sedative.
In April, 1948, when Williams again visited Dr. Stone, he was still wearing the brace and complained of stiffness, weakness and discomfort in his back, and Dr. Stone again advised him that it was very essential to discard his back splint and exercise his back in order to restore the functions of the back muscles. He also advised him to return to light work. Dr. Stone testified that at this time it was his opinion that the plaintiff was not co-operative and had done nothing that had been prescribed for him. In June of 1948, when Dr. Stone saw this plaintiff, there was some rigidity of the back muscles and an appearance of weakness generally which he attributed to the lack of exercise.
On January 21, 1949, Dr. Stone again examined the plaintiff and found the compressed fracture of the first lumbar vertebra healed, but stated in his report, that plaintiff was suffering from weakness which developed from his immobilization in the plaster cast and splints and his lack of co-operation and proper exercise during the last six months. On the 9th day of May,' 1949, the day of the trial, Dr. Stone testified that from an orthopedic standpoint, plaintiff had recovered in that his rib, and vertebra had healed, but that he had not restored the function of the muscles and ligaments involved during the treatment of the fracture, due, in his opinion, entirely to failure to co-operate on the part of the plaintiff in the recommended treatment. On that date, it was Dr. Stone’s opinion that if the plaintiff would carry out instructions he could completely recover within three or four months. He refused to state categorically that the plaintiff could become fully recovered.
Dr. Lubritz, a general practitioner of Amite, examined the plaintiff on February 12, 1949, and at that time took an X-ray,- which is in evidence, and which he interpreted as showing ,an unhealed, un-united fracture of the bilateral transverse process of the first lumbar vertebra, healed fracture of the left transverse process of the third lumbar vertebra, with the appearance of an unhealed fracture at the tip of the right transverse process of the fourth lumbar vertebra, which, however, he *96 stated'might be'due to a blood vessel making a shadow. A physical examination by Dr. • Lubritz revealed normal and ' equal movements of the upper and lower extremities with a definite limitation of the motion of the spine anteriorly and posteriorly, with a tender area over the entire lumbar region: It was Dr. Lubritz’s diagnosis that plaintiff was suffering from “chfonic disability, permanent one hundred per cent from old fracture of lumbar vertebra and vertebra portions.”
Dr. McClendon, on December 6, 1948, wrote a letter to the Insurers Service Corporation, which was handling the claim, that, in' his opinion, further treatment would ¡be useless. Dr. McClendon in his testimony, stated that the plaintiff was totally and permanently disabled, and on April 27, 1949, wrote a letter to the attorney for the plaintiff, which is in evidence; in which he stated that X-rays of the spine of the plaintiff showed “evidence of compressed fracture of the fifth lumbar vertebra with lower displacement of fourth lumbar vertebra which lowers the whole spine,” and also stated that plaintiff was totally and permanently disabled as he was unable to stoop,'and it was an effort for him to sit, and he was unable to work and walked with lack of confidence. His explanation of having written the letter that the plaintiff was a malingerer was that he had been asked to do so by the insurance adjuster' in order “to have a dispute” so that a compromise could be effected. This was most emphatically denied by the adjuster.
We also find in the record on stationery of the Insurers Service Corporation, a report to ¡be executed and mailed upon the discharge of an injured employee, which is dated December 11, 1948, and which contains the various dates on which Thomas Williams w.as treated by Dr. McClendon, and the total cost of the treatments of $252.00. There is a statement: “Describe permanent injury if any.” This is answered, “No”. This report is signed by Dr. McClendon.
Dr. McClendon’s testimony as to whether or not he thought the ■ plaintiff was a malingerer, may be summed up in his own words-: “At"times I did. and at times I didn’t. ■ Now I don’t think he was.” It ■is to be noted also'.that whereas 'his X-ray report shows a reference to “evidence of compressed fracture of ' the fifth lumbar vertebra with lower displacement of the fourth lumbar vertebra which lowers the whole spine”, it fails' to mention any compressed fracture of the first lumbar vertebra. In his testimony, he stated that the X-ray indicated that plaintiff did have a fracture of the transverse process of the first lumbar vertebra.
On June 28, 1948, two X-ray films marked Fortier, Hunt and Brierre were made of the plaintiff’s back, at the request of Dr. C. C. Battalora. These films were examined by Dr. Louis Bristow, radiologist of New Orleans, who interpreted them as showing a lack of fusion of the neural arch of the last lumbar vertebra, known as spina bifida occulta, which is generally a congenital anomaly, and which is in no way connected with the plaintiff’s accident or injury, and he stated that there was no other pathology seen; however, the first lumbar vertebra was shown to be -slightly lower than the vertebra above and below, which the doctor stated was quite often seen as a compression fracture or mild compression fracture of the first lumbar, but that in the plaintiff’s case, he could see no evidence of fracture from the films. In other words, if the plaintiff had suffered a compressed fracture of the first lumbar vertebra, it had so healed that no trace of it was visible on June 6, 1948.
Dr. Bristow was also shown X-ray plate made by Dr. Lubritz and stated in his report and testimony, that while he found no gross pathology in the plate (other than the lack of fusion of the neural arch of the 1st vertebra) the technical qualities of the plate were such that he hesitated to give a definite report. He was also of the opinion thát Dr. Lubritz shpuld have had a lateral view to substantiate any findings which he might or might not have seen from the one X-ray picture which he took.
The same plates of Drs. Fortier, Hunt and Brierre were seen by Dr. Leon J. Man-ville, also a' radiologist of New Orleans, who had been engaged in that field for *97 forty years and who testified that these films were negative for fracture, dislocation, bone and joint disease.' As to .the film of Dr. Lubritz, he thought that, in order to properly interpret it, there should have been,taken also a lateral view; however, on the film as taken, he was unable to see any evidence of fracture of the transverse process.
Dr. J. N. Ane, another radiologist of New Orleans, Louisiana, was shown the films made by Dr. McClendon and stated that while it was difficult to interpret them due to fogginess, that, as far as he could tell, there was' no evidence of fracture or dislocation on these films, but he did see the congenital condition of the first sacral segment. '
Dr. Ane’s interpretation of the Fortier, Hunt and Brierre films as shown by his report, was that “there is evidence of anterior wedging of the body of the first lumbar vertebra which could be the result of an old, healed slightly compression fracture. With this exception, there is no evidence of fracture or dislocation.” His testimony, was to the same effect, although on cross-examination, he corrected his report and testimony by stating that he wished to retract the word- “healed” and testified that he would not attempt to say whether the fracture was healed or not. He did testify that a compressed fracture such as he noted- on the films would not result in any disability to any extent as the amount of wedging shown by the films was “minimal”.
Dr. C. C. Battalora, an expert in the field of orthopedics, examined the plaintiff on two occasions, first on June 28, 1948, and again on January 21, 1949. On the first examination, it was his opinion that he was exaggerating his complaint as there were discrepancies in the reactions in the examination, and he felt‘that since the plaintiff had been wearing a brace, that he should be put on exercise for a period of time and then returned to work. It w.as on this date that the X-ray films of Drs. Fortier, Hunt and Brierre were made at the request of Dr. Battalora, who examined them and testified that' he found them negative for any evidence of bone or joint injury.
On the second examination, the plaintiff was still complaining of his back and that his legs felt weak, he could not sleep on his left shoulder and the pain varied. Dr. Battalora cpuld not find .any orthopedic cause for the plaintiff’s complaints and advised that. the.plaintiff be returned to his previous occupation. It was his opinion that the plaintiff’s spine could be considered normal, and he testified positively that the six inch belt which plaintiff had very high around his abdomen could not possibly have given any assistance to the spine. A similar notation is also found in the report of the Charity Hospital. Dr. Battalora testified , that as far as plaintiff’s. back condition- was concerned, he would not find any reason for the -complaints that he gave him which were of pain “from his head to hi’s sacrum”. Dr. Battalora could find nothing wrong with plaintiff’s muscles, ligaments or bony structures.
In Dr. Battalora’s testimony, he gave a report of an examination made by Drs. Fortier, Hunt and Brierre of their X-ray films in which t.hey reported an old, healed ■compression fracture of the first lumbar vertebra. Dr. Battalora was definitely of the opinion that there was never a fracture óf this vertebra, and that although there was a minimal anterior wedging of the first lumbar -vertebra, that he believed that in the plaintiff’s case, the wedging was due to a change in both the superior and inferior surfaces of the vertebra and was, “therefore a postural or developmental defect in that vertebra and is not due to fracture.” He-did admit that it was possible that plaintiff may have had a compression fracture, but that it had been reduced successfully and “he certainly does not present any evidence of the compression, fracture right' now.” Dr. Battalora stated that he never .applied the word “malingerer” to any one, but instead used the word “exaggeration”, and that in the present instance, he was convinced that the plaintiff was grossly exaggerating his disability, that he was of the opinion that he was suffering no disability and could return to work. He modified this by stating that *98 plaintiff should start out moderately due to his long layoff and lack of exercise, and was of the opinion that any weakness of the muscles ,and other disability that plaintiff might have was due to his inactivity, and he recommended that he return to work as a means of effecting a cure.
In addition, there is also in the record, a copy of the records of Charity Hospital, one of which is dated August 31, 1949, in which it is stated: “X-ray of back shows a spina bifida e spondylolisthesis grade +. This man has had an injury superimposed on these conditions and they are keeping the condition going.” There is in evidence a letter from Dr. Battalora with regard to the Charity Hospital records, in which he states that he was Chief of the Independent Orthopedic Service at Charity Hospital, in which branch of the hospital the plaintiff was examined, and that it is his opinion “that the facts brought out from the record of Charity Hospital do not alter my original statement that this man does not have any disability referable to his alleged accident.”
The record discloses that plaintiff is an illiterate Negro, 26 years of age, with a wife and fotir children, mentally sluggish ■but not to the extent of stupidity, and a common laborer employed by the defendant as a truck driver, hauling logs, at a weekly wage sufficient to grant him the maximum weekly rate of compensation at the time of the accident. Plaintiff testified that Dr. Stone recommended that he take any kind of exercise which he could take, in plaintiff’s words, as follows: “He said to try to stoop as far as I could and to do anything light thing to exercise. I tried every way I knew how to but the pain was so severe that I could not stand to try to stoop and bend. I did that until I got so weak that I could not stand it. I have four children and I tried to help them to ibathe and dress them but I could not do that because I could not set in one place long. I tried to get in the wood but I was unable to do that.”
He testified that at the time of trial, he still rubs with liniment and takes aspirin when the pain is severe; that he wanted to be able to work and take care of his family; that he never lost a day’s work and wanted to work like he had before; that he had no special training; that he has done only manual labor and he knows of no employment that he could get at the present time. His prior “work record” is not questioned, consequently, it must be presumed to have been good. The plaintiff’s testimony, -relative to the 'exercises recommended by Dr. Stone, producing pains to plaintiff, is corroborated by the testimony of Dr. Stone. He states that the plaintiff appears to be mentally sluggish, and also states that if plaintiff attempted to perform the prescribed exercises, there would be pain of such a nature as to render sedatives necessary. The district judge, in 'his well-considered written opinion, states: “I do not feel that the young negro was unreasonable in hesitating to perform exercises which would -cause such pain.”
Generally a plaintiff in a compensation case must prove his claim by a preponderance of the evidence. This rule is now so firmly imbedded in our jurisprudence as to admit of no question.
In the instant case, plaintiff contends that he is still suffering pains in his back. The medical testimony as above detailed is conflicting. Plaintiff’s claim of disability is supported by the testimony of two competent and qualified physicians on the basis of their examination, and somewhat by a third, namely, Dr. Stone. Doctor Stone bases his opinion of the disability of plaintiff on plaintiff’s nonco-operation in the taking of exercises. To the contrary, defendant relies on the testimony of, besides Dr. Stone, three radiologists and orthopedic surgeons.
 Conceding that the plaintiff has failed to prove his claim by a preponderance of the medical evidence, yet we are of the opinion that the testimony of plaintiff, though standing alone, is'of sufficient weight to overcome whatever the medical testimony lacks. As stated before, the trial court was of the opinion that plaintiff’s testimony was convincing that he was suffering pain. His final conclusion was that plaintiff was not a malingerer and had' met the burden of proof by a preponderance of *99 the evidence. It must be borne in mind that it is well established by our courts that a compensation claimant is not stigmatized as a malingerer in the absence of clear, convincing and conclusive proof. In our opinion, the facts in this case do not' accord vtith such an idea.
Generally, if an employee’s improper and unnecessary activity, or inactivity, conduct or misconduct, or his wilful failure to cooperate in the treatment given him seriously retards his recovery and prolongs his disability, he cannot recover compensation beyond the period that would have been necessary for his recovery had he properly cooperated. This rule has no application to the facts in this case for the reason that we are convinced, like the trial judge, that the plaintiff did not deliberately or'wilfully fail to cooperate with Dr. Stone’s recommendation to take the exercises prescribed for -him. He made an honest effort to follow the doctor’s wishes about taking the exercises.
Suffice it to say that, in his well-reasoned written opinion, the trial court concludes that he was “of the very definite opinion that claimant is totally and permanently disabled within the meaning of the Workmen’s Compensation Act [Act No. 20 of 1914,' as amended].”
Finding no manifest error committed by the trial court in his findings of fact, the judgment appealed from is accordingly affirmed.